UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
BOSS WILLIAMS and TASMEEN McCOY, on      :
behalf of themselves and others similarly situated,
                                          :
                Plaintiffs,
                                          :
        -v.-                                              OPINION AND ORDER
                                          :               13 Civ. 5041 (GWG)
TRI-STATE BIODIESEL, L.L.C. and BRENT
BAKER,                                    :

                Defendants.               :
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

　　　　Plaintiffs Boss Williams and Tasmeen McCoy, on behalf of themselves and other

similarly situated employees, have sued their former employer Tri-State Biodiesel, L.L.C.

("TSB") and its Chief Executive Officer, Brent Baker.  Plaintiffs' complaint alleges violations of

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law

("NYLL").  Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56 as to

(1) plaintiffs' overtime claims under the FLSA, (2) plaintiffs' overtime claims under the NYLL,

(3) plaintiffs' claims for "spread of hours" pay under the NYLL, (4) Williams's claims for

unpaid wages under both the FLSA and the NYLL, and (5) plaintiffs' claims that defendants

willfully violated the FLSA.[1]  The parties have consented to have proceedings in this case

---

[1]  See Notice of Motion, dated June 27, 2014 (Docket # 10); Affirmation of Joshua A.
Sabo, dated June 27, 2014 (Docket # 11) ("Sabo Aff."); Defendants Memorandum of Law for
Summary Judgment Pursuant to F.R.C.P. 56, dated June 27, 2014 (Docket # 12) ("Def. Mem.");
Rule 56.1 Statement, dated June 27, 2014 (Docket # 13); Affirmation of Brent Baker, dated June
25, 2014 (Docket # 14) ("Baker Aff."); Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment, dated July 18, 2014 (Docket # 15) ("Pl. Mem.");
Affidavit in Opposition, dated July 17, 2014 (Docket # 16) ("Williams Aff."); Plaintiffs'
Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule
56.1 on Defendants' Motion for Summary Judgment, dated July 18, 2014 (Docket # 17);
Declaration in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment,

conducted by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  As set forth

below, defendants' motion is granted in part and denied in part.

I.      BACKGROUND

        A.      Facts

        Unless otherwise stated, the following facts are either not in dispute or reflect plaintiffs'

version of facts as supported by admissible evidence.

        Baker is the founder and Chief Executive Officer of TSB.  Baker Aff. ¶ 1.  TSB collects

used cooking oil ("UCO") from restaurants and other producers located in and around the New

York area.  Id. ¶¶ 3, 7.  To collect UCO, TSB operates a fleet of trucks, each with a gross vehicle

weight rating of at least 10,001 pounds.  Id. ¶ 4.

        Collection routes of UCO are typically assigned to two-person teams, with one Driver

and one Hose Operator.  Id. ¶ 7.  The team is assigned to a truck and a UCO collection route.  Id.

¶ 13; Williams Aff. ¶ 43.  The Driver drives to each location on an assigned collection route

where the Hose Operator then vacuums UCO from the restaurant into the truck using a hose.

Baker Aff. ¶ 7.  In addition to driving, the Driver is responsible for safety inspections of the

vehicles.  Id.  The Hose Operator is responsible for assisting the Driver with these safety

inspections.  Id.  During the relevant time periods, TSB operated approximately eight collection

routes per day.  Williams Aff. ¶ 26.  Each truck averaged 20-35 collection hauls per collection

route.  Id. ¶ 25.

        TSB collected UCO from restaurants both inside and outside the state of New York.

dated July 18, 2014 (Docket # 18) ("Cilenti Decl."); Reply Affirmation of Brent Baker, dated
Aug. 1, 2014 (Docket # 19) ("Baker Reply Aff."); Defendants Reply Memorandum of Law,
dated Aug. 1, 2014 (Docket # 20) ("Def. Reply Mem.").

Baker Aff. ¶¶ 11-12; TSB's New Jersey Records (annexed as Ex. A to Baker Aff.) ("TSB NJ Records"), though the parties dispute whether this occurred during the entire time period at issue and to what degree interstate travel occurred in relation to the total volume of TSB's business. Williams asserts that TSB operated exclusively within New York until October or November 2010. Williams Aff. ¶¶ 28, 38-39; see also TSB NJ Records. After that time, some assigned collection routes were entirely within New York while others included stops in New Jersey or Connecticut. Baker Aff. ¶ 13.

While defendants assert that all collection routes, including interstate routes, were assigned at random, id. ¶¶ 13-16, Williams contends that collection routes to Connecticut and New Jersey were assigned primarily to certain drivers, Williams Aff. ¶¶ 44-45. According to Williams, Connecticut routes were assigned primarily to Bobby Green, Lorenzo Treglia, and an individual identified as "Ferny," id. ¶ 44, while New Jersey collection routes were primarily assigned to Lorenzo Treglia, Jerome Bonaparte, or Kyle Murray, id. ¶ 44 & n.1. However, if there was an emergency vacancy, a relief driver, such as Williams, would be chosen to travel the interstate collection route. Id. ¶¶ 44-45.

TSB purified the UCO at its facility in the Bronx. Baker Aff. ¶ 8. This process generated wastewater, which required disposal. Id. ¶ 18. Beginning in October 2011, TSB brought this wastewater to New Haven, Connecticut approximately once a week. Id. ¶ 18; Deposition of Brent Baker, dated Apr. 21, 2014 (annexed as Ex. H to Cilenti Decl.) ("Baker Dep."), at 69-70. The truck would return to TSB with UCO from Connecticut for New York. Baker Aff. ¶ 18; Williams Aff. ¶ 32. CT Biodiesel, a separate entity from TSB, was primarily responsible for delivering the wastewater to and retrieving UCO from Connecticut. Williams Aff. ¶¶ 30-31. On "rare" occasions, a TSB driver would be called to fill in, and the driver was

usually someone other than Williams or McCoy.  Id. ¶ 30.

TSB employees were paid their normal hourly rate (that is, "straight time") for hours worked up to 50 per week.  Baker Aff. ¶ 32.  TSB employees were paid time-and-a-half only for hours worked in excess of 50 per week.  Id.  During the relevant time periods, TSB used two main methods to track hours worked by employees.  Id. ¶ 27.  Initially TSB used a system of self-reporting, under which an employee would fill in a time sheet and swear to its accuracy with his or her signature.  Id.  TSB then switched to an automated timecard system, which required employees to punch in when they arrived in the morning and punch out when they left.  Id. ¶ 28.  TSB contends that it also provided procedures for employees to be paid for work that was not reflected on the automated time system by reporting that time to a bookkeeper.  Id. ¶ 30.  Williams contests the availability of such a system, however.  Williams Aff. ¶ 23.

Williams was first employed by TSB in August 2009 as an overnight Pump Operator.  Id. ¶ 3.  Williams initially worked 36 hours per week.  Id. ¶ 4.  In September 2009, Williams began to work 60 hours per week.  Id. ¶ 6.  Later in the fall of 2009, Williams was promoted to the position of UCO Driver.  Id. ¶ 8.  As a Driver, Williams continued to work in excess of 50 hours per week.  Id. ¶ 9.

In October 2010, Williams was promoted to the position of Fleet Supervisor.  Id. ¶ 12.  As Fleet Supervisor, Williams was primarily responsible for receiving collection routes created by a TSB Fuel Dispatcher and distributing routes to Drivers and Hose Operators in the morning.  Id. ¶ 12; Baker Aff. ¶ 33.  At this time, Williams was working 60 hours per week as a Driver.  Williams Aff. ¶ 14.

Williams asserts that his promotion to Fleet Supervisor required him to work an additional 10-15 hours per week from home, for a total of 70 to 75 hours per week.  Id. ¶ 15.  He

states that in addition to performing his responsibilities as Fleet Supervisor, he was responsible for various other functions when he got home from work at night, such as receiving calls from night Drivers, arranging investigations, informing employees of their assigned routes, and taking calls from sick employees.  Id. ¶ 12.  Baker contends that Williams was not required to perform any significant work at home and should have reported that time to the TSB bookkeeper if he did.  Baker Aff. ¶¶ 33-34.  According to Baker, the extra responsibilities cited by Williams were the job of the Dispatcher who was on duty while Williams was at home.  Baker Reply Aff. ¶ 2.  Williams, however, states that he had to perform the job of a "Night Supervisor" in addition to his own responsibilities as a Fleet Supervisor, because the "Night Supervisor" was failing to do his job properly.  Deposition of Boss Williams, dated April 7, 2014 (annexed as Ex. C to Sabo Aff.) ("Williams Dep."), at 26.  Williams continued to work as both a Driver and Fleet Supervisor until his employment with TSB came to an end in June 2012.  Williams Aff. ¶ 24.

Addressing the issue of the amount of interstate travel that Williams engaged in, defendants provide evidence that during the relevant time period (September 2009 to June 2012), Williams worked approximately 687 days as a Driver.  Baker Reply Aff. ¶ 9; TSB Timesheets (annexed as Ex. B to Baker Reply Aff.).  Typically, TSB trucks run one collection route per day.  Baker Reply Aff. ¶ 12.  Defendants contend that out of these 687 days, Williams drove interstate on 26 occasions, consisting of 25 trips to New Jersey and one trip to Connecticut.  Id. ¶¶ 10-11; TSB NJ Records; Bill of Lading, dated Oct. 20, 2011 (annexed as Ex. A to Baker Aff.).

McCoy was initially employed by TSB as a Hose Operator in August 2011.  Deposition of Tasmeen McCoy, dated April 7, 2014 (annexed as Ex. D to Sabo Aff.) ("McCoy Dep."), at 7.  McCoy worked as a Hose Operator until his employment with TSB came to an end in May 2012.  Id. at 8.  McCoy was paid at a rate of $12 per hour.  Id. at 7.  McCoy does not dispute that TSB's

5

records of the hours he worked are correct.  Id. at 11-12; Baker Dep. at 34.  However, defendants

have put no information in the record as to the number of hours McCoy worked or whether he

ever went on an interstate trip.

On June 4, 2009, the United States Department of Labor ("DOL") completed an audit of

TSB's overtime practices from May 21, 2007, to May 18, 2009.  See WHISARD Compliance

Action Report, (annexed as Ex. G to Sabo Aff.) ("DOL Report"), at 1-2.  The DOL concluded

that TSB was in compliance with "all major applicable acts."  Id. at 2.  The DOL discussed the

section 13(b)(1) motor carrier exemption with Baker "at great length."  Id. at 2-4.  Specifically,

the DOL concluded that TSB was not in violation of Section 7 of the FLSA because the

"[d]rivers are exempt from the overtime provisions of the Act under" the motor carrier

exemption.  Id. at 4.

B.    Procedural History

Plaintiffs filed this action to recover unpaid wages, unpaid overtime compensation, and

unpaid spread-of-hours premiums allegedly owed to them by their former employer.  See

Complaint, filed July 19, 2013 (Docket # 1), ¶¶ 1-2.  On June 27, 2014, defendants filed the

instant motion for summary judgment arguing that plaintiffs were exempt from the maximum

hours provisions of the FLSA and NYLL based on the motor carrier exemption, that plaintiffs

were not entitled to spread-of-hours premiums, that Williams failed to produce sufficient

evidence that he was entitled to any unpaid wages, and that defendants did not willfully violate

the FLSA.

II.    LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is

appropriate when "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

      In determining whether a genuine issue of material fact exists, "[t]he evidence of the

non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the

nonmoving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

Nevertheless, once the moving party has shown that there is no genuine issue as to any material

fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come

forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed.

R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation,"

Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted). In other words, the

nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict

in his favor," Anderson, 477 U.S. at 256, and "[a] party opposing summary judgment does not

show the existence of a genuine issue of fact to be tried merely by making assertions that are

conclusory," Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir.

2008) (citation omitted). "Where it is clear that no rational finder of fact could find in favor of

the nonmoving party because the evidence to support its case is so slight, summary judgment

should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal

quotation marks omitted)).

III.     DISCUSSION

A.     FLSA Overtime Claims

The FLSA seeks to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).  It "guarantee[s] compensation for all work or employment engaged in by employees covered by the Act."  Reich v. N.Y.C. Transit Auth., 45 F.3d 646, 648-49 (2d Cir. 1995) (quoting Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602 (1944)). The FLSA requires employers to pay overtime for employment in excess of 40 hours per week "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."  29 U.S.C. § 207(a)(1).

The FLSA, however, exempts certain employees from its overtime requirements.  The Second Circuit has held that "because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed," and "an employer bears the burden of proving that its employees fall within an exempted category of the Act."  Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991) (citations omitted); accord Bilyou v. Dutchess Beer Distribs. Inc., 300 F.3d 217, 222 (2d Cir. 2002) ("[E]xemptions to the FLSA are narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.  The burden of invoking these exemptions rests upon the employer.") (internal quotation marks and citations omitted).

1.     Motor Carrier Exemption

i.     Statutory Framework

One category of employees exempted from the FLSA's overtime requirements is  "any employee with respect to whom the Secretary of Transportation has power to establish

8

qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1). "Courts have consistently held that the § 213(b)(1) exemption to § 207 applies regardless whether the Secretary of Transportation has exercised his authority to regulate a particular employee or employer." Bilyou, 300 F.3d at 229 (citations omitted).

A separate statute states that the Secretary of Transportation has the power to establish "qualifications and maximum hours of service of employees of . . . a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2) (the "motor carrier exemption"). A "motor private carrier" in turn is defined as a person "transporting property by motor vehicle when – (A) the transportation is as provided in section 13501 of this title; (B) the person is the owner, lessee or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 13102(15). Section 13501 provides that the Secretary of Transportation has jurisdiction if the transportation of property occurs, inter alia, on a public highway "between a place in – (A) a State and a place in another State; [or] (B) a State and another place in the same State through another State." 49 U.S.C. § 13501.

The activities of the employer are only part of the equation. To come within the motor carrier exemption, an examination must be made also of "the activities of the individual employees." Goldberg v. Faber Indus., Inc., 291 F.2d 232, 235 (7th Cir. 1961). According to the Department of Labor regulations, the employee must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a); accord Dauphin v. Chestnut Ridge Trans., Inc., 544 F. Supp. 2d 266, 274 (S.D.N.Y. 2008). "There are four broad categories of workers whose duties

9

are said to directly affect the safety of vehicle operation: drivers, mechanics, loaders, and helpers of the first three." Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC, 865 F. Supp. 2d 257, 266 (E.D.N.Y. 2012) (citing Levinson v. Spector Motor Serv., 330 U.S. 649, 673 (1947)).  If not all of an employee's activities affect the safety of operations of motor vehicles in interstate commerce, a court must consider "the character of the activities rather than the proportion of either the employee's time or his activities."  Morris v. McComb, 332 U.S. 422, 431-32 (1947) (internal quotation marks and citation omitted).

It is undisputed that TSB is the owner, lessee, or bailee of UCO being transported in furtherance of a commercial enterprise; that UCO constitutes "property" under 49 U.S.C. § 13102(15), see Pl. Mem. at 28-29; and that both Williams's job as a Driver and McCoy's job as a Hose Operator, which required him to assist Drivers with safety inspections of vehicles, directly affect the safety of operation of motor vehicles, see Dauphin, 544 F. Supp. 2d at 274 ("The activities of drivers affect safety of operations of motor vehicles.") (citing 29 C.F.R. § 782.2(a); Morris, 332 U.S. at 430; Levinson, 330 U.S. at 675-76).  The only point of disagreement is whether the plaintiffs' activities or TSB's alleged dearth of interstate activities take plaintiffs outside the motor carrier exemption of the FLSA.

    ii.    The Employee's Interstate Activities

The relevant Department of Labor regulations provide:

(2)  . . . .  In determining whether an employee falls within [the motor carrier exemption], neither the name given to his position nor that given to the work that he does is controlling (Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695; Porter v. Poindexter, 158 F.--(2d) 759 (C.A. 10); Keeling v. Huber & Huber Motor Express, 57 F. Supp. 617 (W.D. Ky.); Crean v. Moran Transp. Lines (W.D. N.Y.) 9 Labor Cases, par. 62,416 (see also earlier opinion in 54 F. Supp. 765)); what is controlling is the character of the activities involved in the performance of his job.

10

(3)  As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, driver's helpers, loaders, or mechanics employed by a common carrier and engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2) of this section, he comes within the exemption in all workweeks when he is employed at such job.  This general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in interstate commerce.  Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation." On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties.  (Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695; Morris v. McComb, 332 U.S. 422; Levinson v. Spector Motor Service, 330 U.S. 649; Rogers Cartage Co. v. Reynolds, 166 F. (2d) 317 (C.A. 6); Opelika Bottling Co. v. Goldberg, 299 F. (2d) 37 (C.A. 5); Tobin v. Mason & Dixon Lines, Inc., 102 F. Supp. 466 (E.D. Tenn.))  If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.

(4)  Where the same employee of a carrier is shifted from one job to another periodically or on occasion, the application of the exemption to him in a particular workweek is tested by application of the above principles to the job or jobs in which he is employed in that workweek . . . .

29 C.F.R. § 782.2(b).

Consistent with this regulation, case law holds that where "interstate travel constitutes a 'natural, integral and . . . inseparable part' of the employees' duties, such that any employee is likely to be called on to perform interstate travel, the employees are all subject to the motor carrier exemption while they fill that position regardless of the actual number of hours they

individually devote to interstate travel."  Dauphin, 544 F. Supp. 2d at 274-75 (quoting Morris,

332 U.S. at 433); see also Roberts v. Cowan Distrib. Servs., LLC, 2014 WL 5811067, at *13

(E.D. Va. Nov. 11, 2014) ("Even where the employer assigns relatively few interstate routes, the

[motor carrier exemption] applies where any driver could have received one of those routes.")

(citation omitted); Masson v. Ecolab, Inc., 2005 WL 2000133, at *6 (S.D.N.Y. Aug. 17, 2005)

("[I]f the employee is or 'is likely' to be 'called upon in the ordinary course of his work to

perform, either regularly or from time to time, safety-affecting activities,' he falls under the

exemption 'in all workweeks when he is employed at such job.'") (quoting 29 C.F.R.

§ 782.2(b)(3)); Badgett v. Rent-Way, Inc., 350 F. Supp. 2d 642, 656-57 (W.D. Pa. 2004) (finding

employees within the exemption "regardless of the number of interstate/intrastate trips they

actually made because, at all relevant times, they could have been called upon in the regular

course of their employment to make trips affecting interstate commerce") (emphasis omitted).

 Thus, the fact that an individual employee within a job performs no activities governed

by the exemption or even that the job holders engage in few such activities is not necessarily

dispositive.  In the Supreme Court case of Morris, the total percentage of interstate trips made by

employees was only 3.65% of the total number of trips.  332 U.S. at 433.  However, on average,

24.4% of the employer's drivers made an interstate trip each week.  Id.  Throughout the year,

95% of the drivers had made at least one interstate trip.  See id.  Notwithstanding the fact that a

small number of drivers — 2 out of a total of 43 — made no interstate trips, id., Morris found

that the motor carrier exemption applied to the entire class of drivers, id. at 433-36.  It noted that

> in the normal operation of the business, the[] strictly interstate commerce trips
> were distributed generally throughout the year and their performance was shared
> indiscriminately by the drivers and was mingled with the performance of other
> like driving services rendered by them otherwise than in interstate commerce.
> These trips were thus a natural, integral and apparently inseparable part of the

common carrier service of the petitioner and his drivers.

Id. at 433; accord Griffin v. Consol. Foods Corp., 771 F.2d 826, 828-29 (4th Cir. 1985) (where employer's sales representatives were "indiscriminately" assigned to sales circuits — some of which included interstate travel — semi-annually, "the fact that a particular representative may never have received an interstate route is unpersuasive.").  The Department of Labor regulations emphasize that Morris found that all of the drivers in that case were exempt "even though the interstate driving o[f] particular employees was sporadic and occasional, and in practice some drivers would not be called upon for long periods to perform any such work."  29 C.F.R. § 782.2(c)(1) (citing Morris, 332 U.S. 422).

To examine this aspect of the motor carrier exemption, courts conduct a "fact-specific analysis, including an examination of the method by which the employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intrastate employee activity."  Masson, 2005 WL 2000133, at *9.  "[I]ndiscriminate" assignment may be shown "when an employee's interstate travel is dictated by that employee's duties rather than by an assigned route."  Sturm v. CB Transport, Inc., 943 F. Supp. 2d 1102, 1112, 1114 (D. Idaho 2013) ("[T]he exemption as applied to an individual employee depends upon the activities of the individual; what is controlling is the character of the activities involved in the performance of his or her job."); see also Dauphin, 544 F. Supp. 2d at 274 ("[A] defendant generally must present evidence as to the character of the activities of each plaintiff in order to determine whether he or she is subject to the exemption.") (quoting Masson, 2005 WL 2000133, at *6).  In the case of drivers, courts often phrase the ultimate issue as whether the employee could "reasonably" have "expected" to drive in interstate commerce.  E.g., Reich v. Am. Driver Serv., Inc., 33 F.3d 1153, 1157 (9th Cir. 1994); Badgett,

13

350 F. Supp. 2d at 658; <u>Garcia v. Pace Suburban Bus Serv., a Div. Of Reg'l Transp. Auth.</u>, 955 F. Supp. 75, 77 (N.D. Ill. 1996).  One recent case has teased out the following factors from case law to aid in determining whether an employee had a reasonable expectation to be called upon to drive in interstate commerce: "(1) the proportion of interstate to intrastate employee activity; (2) the method by which a carrier assigns the interstate activity to its employees; and (3) the overall nature of the carrier's business." <u>Bishop v. Petro-Chem. Transp., LLC</u>, 582 F. Supp. 2d 1290, 1298 (E.D. Cal. 2008) (citing <u>Kosin v. Fredjo's Enters., Ltd.</u>, 1989 WL 13175 (N.D. Ill. 1989)). Another case has looked to "the employer's efforts to comply with federal requirements, the information conveyed from the employer to the employee, treatment of the entire group of employees and actual job performance of the individual employee." <u>Roberts</u>, 2014 WL 5811067, at *12.

One court — adverting to "tension in the case law" — has questioned whether the exemption should be applied whenever it is shown that the employee is asked to engage in interstate travel, even if only minimally, noting that some courts have instead focused on the employee's "normal" or "regular" duties. <u>Thompson v. K.R. Drenth Trucking, Inc.</u>, 2011 WL 2446282, at *2-3 (S.D. Ind. June 15, 2011) (internal quotation marks and citations omitted).

iii.    <u>Time Frame Of Analysis</u>

Case law frequently holds that the examination of the job duties of the allegedly exempt employee is not to be analyzed based on the entire period of employment, or even on an annual basis, but rather on a week-by-week basis. <u>Masson</u>, 2005 WL 2000133, at *7 ("[T]he only way to determine the overtime compensation owed to an employee is to examine the job duties of the employee for each week of employment."); <u>accord</u> <u>McCann v. W.C. Pitts Constr. Co., Inc.</u>, 2011 WL 3924855, at *8 (S.D. Miss. Sept. 7, 2011) (whether employees' activities qualify the

employer for the exemption "is determined on a weekly basis") (citation omitted).  This principle

derives from the fact that the governing regulations state that even when an employee does not

fall into the motor vehicle exemption test set forth in <u>Morris</u>, "[i]f in particular workweeks other

duties are assigned to him which result, in those workweeks, in his performance of activities

directly affecting the safety of operation of motor vehicles in interstate commerce on the public

highways, the exemption will be applicable to him those workweeks, but not in the workweeks

when he continues to perform the duties of the non-safety-affecting job."  29 C.F.R.

§ 782.2(b)(3).  The regulations go on to state that where an employee of a private carrier is not

"require[d] . . . to engage regularly in exempt safety-affecting activities" and where that

employee's "engagement in such activities occurs sporadically or occasionally as the result of

his work assignments at a particular time, the exemption will apply to him only in those

workweeks when he engages in such activities."  29 C.F.R. § 782.2(b)(4); <u>see</u> <u>Crooker v. Sexton</u>

<u>Motors, Inc.</u>, 469 F.2d 206, 210-11(1st Cir. 1972) (remanding to the district court to determine

whether there were some weeks the plaintiff did not drive interstate and stating that the motor

carrier exemption would not apply for any such weeks); <u>Masson</u>, 2005 WL 2000133, at *7; <u>see</u>

<u>also</u> <u>Barrios v. Suburban Disposal, Inc.</u>, 2013 WL 6496243, at *7-8 (D.N.J. Dec. 11, 2013)

(denying motion for summary judgment because the court could not find as a matter of law that

plaintiffs could "have reasonably been expected to make" interstate trips where plaintiffs were

assigned "quasi-permanent" intrastate routes that remained the same each day but were

occasionally given an interstate route); <u>Pritchett v. Werner Enters., Inc.</u>, 2013 WL 4524337, at

*8 (S.D. Ala. Aug. 27, 2013) (where two employees made only four interstate trips, confined to a

single week during a three year period, they had, "at most, . . . a duty [to travel interstate]

assigned 'in particular workweeks,'" and "[i]f that is so, [they] . . . may be exempt for the single

week"); <u>Hernandez v. Brink's, Inc.</u>, 2009 WL 113406, at *6 (S.D. Fla. Jan. 15, 2009) ("[W]hen an employee's duties change so significantly that the change in duties constitutes a change from one job to another, the applicability of the FLSA's motor carrier exemption may vary from week to week."); <u>McGee v. Corporate Express Delivery Sys.</u>, 2003 WL 22757757, at *7 (N.D. Ill. Nov. 20, 2003) (an employer "can show that a driver is not entitled to overtime under the FLSA only if it can show that for each week of his employment, the driver was assigned or was likely to be assigned to a[n] . . . interstate . . . route.").

The notion that a court should examine the activities of an employee on a week-by-week basis, however, is not without critics. Thus, <u>Shoemaker v. United Parcel Serv., Inc.</u>, 2011 WL 836998, at *10-11 (D. Idaho Feb. 10, 2011), held that where an employee's job title remained unchanged, it did not matter that his duties occasionally shifted during the course of his employment. Courts often decline to engage in a week-by-week analysis where it is clear that the reasonable expectation of interstate travel was continuous throughout the period of employment. <u>See</u> <u>Jaramillo v. Garda, Inc.</u>, 2012 WL 4955932, at *4-5 (N.D. Ill. Oct. 17, 2012) (finding a "week-by-week analysis" of whether plaintiffs worked on vehicles weighing less than the minimum weight required by the motor carrier exemption to be "burdensome," since it concluded "that all Plaintiffs could be expected to be a driver or messenger in a large vehicle on any given day of their employment") (citations omitted); <u>Elliot v. Dave Ernstes & Sons Trucking</u>, 2006 WL 2849705, at *5-6 & n.10 (S.D. Ind. Oct. 3, 2006) (finding it "not necessary" to analyze the employees' activities on a week-by-week basis because at "[a]ny time during their employment, these drivers could have been asked to travel out of state," and thus even "[t]aking the evidence in a light most favorable to them, Plaintiffs were likely to engage in interstate commerce during their entire employment."); <u>Harrington v. Despatch Indus., L.P.</u>, 2005 WL

16

1527630, at *6-7 (D. Mass. June 29, 2005) (finding the week-by-week analysis "inapplicable"

because interstate travel was an "integral part" of plaintiff's "continuing duties") (citations

omitted).

The United States Department of Transportation ("DOT") has issued its own

interpretation of its jurisdiction to regulate drivers engaged in interstate commerce through the

Federal Highway Administration ("FHWA").  See 46 Fed. Reg. 37,902 (July 23, 1981).  After

addressing relevant case law, the DOT concluded that it has jurisdiction under 49 U.S.C. § 304

over an individual driver if the driver is:

> called on, or is subject to being called on, to drive in interstate commerce as part
> of the driver's regular employment . . . .  This jurisdiction applies even if the
> driver has not personally driven in interstate commerce if, because of company
> policy and activity, the driver could reasonably be expected to do interstate
> driving . . . .  In determining the reasonable expectation, the courts will look at
> whether the carrier (employer) does any interstate work or whether the carrier is
> actively attempting to obtain interstate work during the period in question.  If the
> carrier does interstate work or advertises for such work and assigns drivers
> randomly to that driving, all the drivers are under the [DOT's] jurisdiction . . . .
> Jurisdiction does not attach if there is no possibility of the individual driver doing
> interstate driving or if the possibility of interstate driving is remote.

Id. at 37,903 (citations omitted).

The DOT noted the "week-by-week approach," as well as case law rejecting its

application.  Id. (citations omitted).  Instead of adopting this approach, the DOT stated that

"[o]nce a driver is subject to jurisdiction under 49 U.S.C. 304, the driver remains so far longer

than a week, but jurisdiction cannot be implied for a lengthy period of time based on only a few

interstate trips during a 1-month period."  Id.  The DOT interpretation goes on to state:

> [e]vidence of driving in interstate commerce or being subject to being used in interstate
> commerce should be accepted as proof that the driver is subject to 49 U.S.C. 304
> for a 4-month period from the date of the proof.  The FHWA believes that the
> 4-month period is reasonable because it avoids both the too strict week-by-week
> approach and the situation where a driver could be used or be subject to being

used once and remain subject to jurisdiction under 49 U.S.C. 304 for an unlimited
time.

Id.  The DOL has acknowledged the DOT's 4-month rule, see U.S. Department of Labor Field
Assistance Bulletin No. 2010-2, dated Nov. 4, 2010, at 1; Johnson v. Hix Wrecker Serv., Inc.,
651 F.3d 658, 662 n.2 (7th Cir. 2011), and several courts have applied it as well, see Johnson,
651 F.3d at 663 (affirming denial of motion for summary judgment where evidence did not
"establish that [the employee] was subject to being used in interstate commerce during a
four-month period or during any other "reasonable period of time") (citation omitted); Buscarino
v. TQ Logistics, Inc., 2010 WL 3211708, at *6 (D.S.C. Aug. 11, 2010) (for the exemption to
apply, the employer "will need to show that each [employee] seeking overtime though [sic] th[e]
action was subject to being used in interstate commerce at some point at least four months prior
to the pay period at issue"); Veliz v. Cintas Corp., 2008 WL 4911238, at *6 (N.D. Cal. Nov. 13,
2008) (declining to apply a "week-by-week approach" to the motor carrier exemption and
instead finding it "sufficient, from time to time within any four month period, that the employee
actually transports or is available to transport across state lines as part of the employee's regular
course of employment") (citations omitted); Molina v. First Line Solutions LLC, 566 F. Supp.
2d 770, 782-83 (N.D. Ill. 2007) ("Rather than a week-by-week approach, the Department of
Labor and Department of Transportation have applied a rule that an employee will be considered
to be engaging in transportation in interstate commerce for four months after each proven
incident of transporting a shipment in interstate commerce.") (citations omitted); Ballou v. DET
Distrib. Co., 2006 WL 2035729, at *14 (M.D. Tenn. July 17, 2006) ("Where a carrier has been
shown to operate in interstate commerce, the Secretary of Transportation will assert jurisdiction
over an employee for a 4-month period beginning on the last date the employee could have been

18

called upon to make an interstate run.") (citation omitted); <u>Chao v. Gary Bauerly, LLC</u>, 2005 WL 1656915, at *4 n.2 (D. Minn. July 14, 2005) ("Evidence that an employee drove in interstate commerce or was subject to being used in interstate commerce is sufficient to exempt the employee for a four month period.") (citation omitted).

iv.   "<u>*De Minimis*</u>" Exception

If the governing legal principles were not murky enough already, case law also occasionally refers to the possibility that there is a "<u>de</u> <u>minimis</u> exception" to the motor carrier exemption.  <u>Friedrich v. U.S. Computer Servs.</u>, 974 F.2d 409, 416 (3rd Cir. 1992); <u>accord Seagram v. David's Towing & Recovery, Inc.</u>., 2014 WL 5341399, at *6 (E.D. Va. Oct. 20, 2014).

It appears that courts refer to "<u>de</u> <u>minimis</u>" activities for three possible purposes: (1) to find that the employee's activities in relation to safety in interstate commerce may be so trivial as to take the employee out of the motor carrier exemption; (2) to permit an employer to take advantage of the motor carrier exemption on the mere showing that the employee's activities in relation to safety in interstate commerce are <u>more</u> than <u>de</u> <u>minimis</u>; and (3) to refuse to apply the motor carrier exemption altogether if can be shown that the employer's activities in interstate commerce are <u>de</u> <u>minimis</u> in relation to the employer's activities overall.

The first iteration of the "exception" derives from the Supreme Court's ruling in <u>Pyramid Motor Freight Corp. v. Ispass</u>, 330 U.S. 695 (1947), which held that an employee's placing of articles of freight on a motor carrier truck may form "so trivial, casual or occasional a part of an employee's activities" that his activities will not come within the kind of "loading" described in the governing regulations as governing the "safety of operations."  <u>Id.</u> at 708.  This concept has been expanded to encompass the notion that if the employee's activities in interstate commerce

19

generally are <u>de minimis</u>, the motor carrier exemption should not apply.  <u>See</u>, <u>e.g.</u>, <u>Reich</u>, 33 F.3d at 1155-56.  The courts that have appeared receptive to applying the principle to drivers suggest that it could be used "only when the interstate-travel portion of the employees' work can be characterized as 'infinitesimal.'"  <u>Anderson v. Timber Prods. Inspection, Inc.</u>, 334 F. Supp. 2d 1258, 1262 (D. Or. 2004) (citation omitted).  One court has suggested that lack of interstate activity in and of itself reflects that a driver could not reasonably "be expected" to engage in interstate activity.  <u>See</u> <u>Garcia</u>, 955 F. Supp. at 77 ("[J]urisdiction extends only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility.") (citation omitted).

Application of the "exception" in this context becomes problematic, however, where the employee's activities consist of driving.  As the First Circuit has pointed out, the Court in <u>Pyramid</u> "was concerned with the question of whether the substantial part of the employees' activities which affected interstate commerce also affected safety . . . .  This is a different issue than the question of whether a substantial part of all the employee's activities interstate and intrastate, affect interstate commerce."  <u>Crooker</u>, 469 F.2d at 209 (internal citation omitted).  Thus, <u>Crooker</u> concluded that "[t]he <u>de minimis</u> rule has been applied in this context where the employee's connection with anything affecting interstate motor carrier operations was so indirect and casual as to be trivial."  <u>Id.</u> at 210 (citation omitted).  By contrast, "[t]he activities of one who drives in interstate commerce, however frequently or infrequently, are not trivial."  <u>Id.</u> Other cases have followed this reasoning when it comes to suits brought by drivers.  <u>See</u>, <u>e.g.</u>, <u>Roberts</u>, 2014 WL 5811067, at *11 ("An isolated delivery in interstate commerce may be <u>de minimis</u> such that the employee still does not qualify as a driver; however, courts have hesitated to apply the <u>de minimis</u> principles in this context, because driving in interstate commerce

20

significantly affects the safety of motor vehicle operations.") (citations omitted); Shoemaker, 2011 WL 836998, at *9 (the "de minimis principle . . . should seldom, if ever, be applied to drivers because of the direct effect of driving on the safety of motor vehicle operations") (internal quotation marks and citation omitted); Badgett, 350 F. Supp. 2d at 656 ("[C]ourts have found drivers to be covered by the motor carrier exemption even where they engage in, or are subject to, only a small percentage of interstate driving.") (citations omitted); Turk v. Buffets, Inc., 940 F. Supp. 1255, 1261 (N.D. Ill. 1996) ("Courts have . . . generally held that the de minimis rule does not exempt drivers from DOT jurisdiction.") (emphasis in original); Sinclair v. Beacon Gasoline Co., 447 F. Supp. 5, 11 (W.D. La. 1976) ("[T]he de minimis rule should seldom, if ever, be applied to one who drives a motor vehicle carrying property . . . in interstate commerce.").  Under these courts' views, the fact that a driver may be responsible for engaging in only a tiny percentage of interstate activity compared to his overall activity is not by itself enough to negate the applicability of the motor carrier exemption.  See Shoemaker, 2011 WL 836998, at *9 ("Courts that have applied the de minimis exception generally view the employer's activities as a whole and the relationship of the individual's interstate trips to the employer's interstate activities to determine whether an employee falls under the [motor carrier] exemption."); Brennan v. Cardinal Indus., Inc., 1976 WL 1720, at *1, *6  (S.D. Ohio Mar. 8, 1976) (exemption applied where "the responsibilities of the trucking department were assigned indiscriminately to drivers" even though "less than one percent of the trips made by defendant's truck drivers were in interstate transportation").  Rather, the critical issue is whether the interstate trips were "a natural, integral and apparently inseparable part of the common carrier service of the [employer] and of [its] drivers."  Morris, 332 U.S. at 433.  We leave to another day the resolution of this dispute as it is not directly raised by the parties here.

21

The concept of de minimis activity as applied to the motor carrier has at times been articulated in a different manner: specifically, to suggest that a defendant's showing of interstate activity by an employee that is more than de minimis is sufficient to demonstrate the applicability of the exemption.  Thus, in Dauphin, the court stated that "for the motor carrier exemption from the FLSA to apply, defendants here must establish either that the activities of the individual plaintiffs involved interstate travel of a character that was more than de minimis or that interstate travel was a 'natural, integral and . . . inseparable part' of the position plaintiffs held."  544 F. Supp. 2d at 275 (emphasis added) (citation omitted).  By phrasing the test in the alternative, Dauphin suggests that an employer's mere showing that an employee engages in more than de minimis interstate activity would be sufficient to invoke the motor carrier exemption.  Other courts have repeated and even applied this concept.  See, e.g., Solis v. R.M. Intern., Inc., 2012 WL 912942, at *5 (D. Or. Mar. 16, 2012); Romero v. Flaum Appetizing Corp., 2011 WL 812157, at *4 (S.D.N.Y. Mar. 1, 2011) (quoting Dauphin, 544 F. Supp. 2d at 275); Shoemaker, 2011 WL 836998, at *8; Anderson, 334 F. Supp. 2d at 1263 (because employees' interstate travel was more than de minimis, the motor carrier exemption applied).

We recognize that there may be some force to this test inasmuch as the higher the amount of interstate travel engaged in by an employee, the less likely it will be that the employee could show that his interstate activities were not a "natural, integral and . . . inseparable part" of his job duties.  Morris, 332 U.S. at 433.  But the "more than de minimis test" has received only sporadic support in case law.  And given that the origin of the de minimis exception — traceable to Pyramid's recognition that an employee's duties may so minimally touch on safety that the employee should not be included within the exemption — we do not see a warrant for concluding that the applicability of the motor carrier exemption may turn exclusively on an

22

evaluation of whether the plaintiffs' interstate activities crosses the <u>de minimis</u> threshold.

Instead, we believe it more appropriate to look at the tests articulated in the regulations and in

<u>Morris</u> to determine if the "character" of the activities of each plaintiff justifies application of the

exemption, including most importantly whether interstate work was assigned "indiscriminately."

<u>Morris</u>, 332 U.S. at 431, 433; <u>accord</u> <u>Vidinliev v. Carey Int'l, Inc.</u>, 581 F. Supp. 2d 1281, 1287

(N.D. Ga. 2008) (rejecting application of a <u>de minimis</u> analysis in favor of the test in <u>Morris</u>);

<u>see</u> <u>also</u> <u>Badgett</u>, 350 F. Supp. 2d at 654 ("In determining whether an employee's job

responsibilities have a substantial impact on interstate commerce highway safety, it is the <u>nature</u>

of the employee's regular job duties that is most important, not necessarily the <u>percentage</u> of the

employee's involvement in duties affecting highway safety in interstate commerce . . . .")

(emphasis in original).

       Finally, to add to the confusion, courts employ an entirely different application of the

concept of <u>de minimis</u> interstate activity in some instances by looking to whether the <u>employer</u>

as a whole (rather than the employees) conducts more than <u>de minimis</u> interstate operations.

Under this usage of the term, courts have concluded that <u>de minimis</u> interstate activity will bar

an employer from claiming the exemption at all, regardless of how the interstate activity is

distributed among employees.  <u>See</u>, <u>e.g.</u>, <u>Flowers v. Regency Transp., Inc.</u>, 535 F. Supp. 2d 765,

769 (S.D. Miss. 2008) (rejecting application of motor carrier exemption because employer failed

to show that it "engaged in more than de minimis interstate commerce"); <u>Rossi v. Associated</u>

<u>Limousine Servs., Inc.</u>, 438 F. Supp. 2d 1354, 1361 (S.D. Fla. 2006) ("[T]he Secretary of

Transportation has the power to set maximum hours for drivers if the company engages in more

than <u>de minimi</u> interstate commerce which includes a company that holds itself out as an

interstate company and solicits that business even though its prospect of obtaining such business

23

is poor and some of its drivers never drive in interstate commerce.") (citations omitted); Masson, 2005 WL 2000133, at *8 ("[W]here the employer's interstate activities affecting the safety of interstate motor operations are de minimis, the employer's exemption from FLSA requirements under the [Motor Carrier Act] consequently fades.") (internal quotation marks and citation omitted); Williams v. Alex's Transp., Inc., 969 F. Supp. 1142, 1144 (N.D. Ill. 1997) ("The exemption is clearly applicable to drivers if their company engages in more than de minimis interstate commerce.") (citation omitted); Peraro ex rel. Castro v. Chemlawn Servs. Corp., 692 F. Supp. 109, 114 (D. Conn. 1988) ("The Secretary's power wanes, and the employer's section 213(b) exemption consequently fades, only when the employer's interstate activities affecting the safety of interstate motor operations are de minimis.") (citations omitted); Kimball v. Goodyear Tire & Rubber Co., 504 F. Supp. 544, 548 (E.D. Tex. 1980) (motor carrier exemption inapplicable where only 0.17% of employer's overall trips were interstate); Coleman v. Jiffy June Farms, Inc., 324 F. Supp. 664, 670 (S.D. Ala. 1970) (exemption inapplicable where 0.23% of employer's overall trips were interstate), aff'd, 458 F.2d 1139 (5th Cir. 1972); cf. Walters v. Am. Coach Lines of Miami, Inc., 569 F. Supp. 2d 1270, 1284-85 (S.D. Fla. 2008) (analyzing employer's activities and concluding that its activities were more than de minimis where more than 4% of employer's activities were interstate).

2.    Analysis

Defendants seek summary judgment as to plaintiffs' FLSA overtime claims based on the applicability of the motor carrier exemption and its assertion that UCO collection routes, including interstate routes, were assigned randomly to Drivers and Hose Operators.  Def. Mem. at 4; Baker Aff. ¶¶ 13-16.  As defendants put it, "[o]n any given day, a [TSB] Driver and a [TSB] Hose Operator can be required to travel out of New York to further [TSB's] business purpose of

the collection of used cooking oil." Def. Mem. at 4.  They also point to the fact that Williams

actually made trips out of state. Id. at 5.  The question of the nature of the assignments is plainly

disputed, however, inasmuch as Williams contends that interstate routes were primarily assigned

to certain employees, and alternates were used only in emergency relief.  Williams Aff. ¶¶ 42-

46.  Indeed, defendants' own records show that a majority of interstate collection routes to New

Jersey between November 2010 and June 2012 were assigned to a Driver named Lorenzo

Treglia.  See TSB NJ Records.  The evidence put forth by the parties is sufficient to conclude

that there is a dispute of fact as to whether the assignment of interstate routes was done

"indiscriminately."  As in another case that found an issue of fact as to the motor carrier

exemption, the record does not disclose the exact method of "how these runs were assigned . . . .

[n]or is it clear whether interstate [collection routes] were an expected and essential part of [each

employee's] normal duties or were, instead . . . distinct from their core duties performing regular

runs." Dauphin, 544 F. Supp. 2d at 276 (citing Masson, 2005 WL 2000133, at *1, *11-12).  In

other words, we cannot determine, as a matter of law, that the interstate travel that Williams was

required to perform was a "natural, integral and . . . inseparable part" of his duties, Morris, 332

U.S. 433, for the entire period he was employed.  Certainly, this is not a case where defendants

have shown that plaintiffs "at all times, could reasonably be expected to engage in interstate

commerce driving on behalf of [TSB]."  Badgett, 350 F. Supp. 2d at 657-58.

Moreover, the only interstate trips that defendants assert Williams made occurred during

the period of November 2010 through June 2012.  See Baker Reply Aff. ¶¶ 10-11; TSB NJ

Records; Bills of Lading (annexed as Ex. A to Baker Aff.).  Thus, even if it could be shown that

during this time period Williams's duties included the expectation of making interstate trips,

there is no information on the period prior to November 2010.[2]  Williams provides evidence that TSB was not engaged in interstate activity at all until it began picking up UCO from New Jersey in "late 2010 or early 2011."  Williams Aff. ¶¶ 38-39.  In other words, this gap suggests that during this time period interstate travel was not even an integral part of the job duties of any Driver, including Williams.  Thus a jury might easily conclude that even if Williams's interstate activity beginning in November 2010 placed him within the motor carrier exemption, his interstate activity prior to that date was of an entirely different character.  See, e.g., Dauphin, 544 F. Supp. 2d at 275 (because "testimony fail[ed] to establish whether interstate travel was part of either plaintiff's job duties during the entire period at issue in this litigation, the Court cannot determine whether the motor carrier exemption applies to them for all the relevant workweeks").  Defendants have not sought to parse this time period but instead seek summary judgment as to the entire period of Williams's employment.  The lack of clarity as to defendants' practices in the pre-November 2010 time period by itself requires the denial of defendants' motion.

As to McCoy, defendants argue that "[n]owhere . . . is there any evidence that Hose Operators such as Tasmeen McCoy were not assigned at random to the interstate waste cooking oil collection routes described in the [TSB NJ Records]."  Def. Reply Mem. at 8.  However, the burden of proving the exemption applies falls on the employer, not the employee.  See, e.g., Martin, 949 F.2d at 614.  Defendants have not shown that McCoy made even one interstate trip and, as already noted, plaintiffs have supplied testimony that the method of assignment of trips — including to Hose Operators — was such that there was essentially no chance that

_____

[2]  Defendants state that Williams did not work more than 40 hours prior to February 2010 as a Driver.  Baker Reply Aff. ¶ 13.  But this statement does not account for the period between February 2010 and November 2010.

26

McCoy could be assigned an interstate trip.  See generally Williams Aff. ¶¶ 42-46.

Moreover, plaintiffs have proffered evidence that the amount of interstate activity engaged in by TSB overall was so "infinitesimal" in proportion to TSB's overall business that it should not be able to invoke the motor carrier exemption as to either plaintiff.  See Anderson, 334 F. Supp. 2d at 1262.  Plaintiffs assert that the total number of interstate trips was 820 out of a total of approximately 150,000 to 263,000 trips.[3]  Williams Aff. ¶¶ 26, 40; Pl. Mem. at 21-25 (citing New Jersey Records (annexed as Ex. A to Cilenti Decl.); Bills of Lading from Beltway Biodiesel (annexed as Ex. C to Cilenti Decl.); Bills of Lading from CT Biodiesel (annexed as Ex. D to Cilenti Decl.); Bills of Lading from TSB to Synagro Disposal Plant (annexed as Ex. G to Cilenti Decl.)).  In other words, plaintiffs claim that the interstate travel was at best 0.55% of TSB's business.  This low percentage may be enough to take defendants out of the exemption altogether regardless of plaintiffs' particular activities.  See Flowers, 535 F. Supp. 2d at 769-70 (rejecting application of the motor carrier exemption where employer failed to show that it "engaged in more than de minimis interstate commerce") (citing cases where percentages of interstate activity from 0.17% to 0.23% were found to bar a employer's invocation of the motor carrier exemption).  While defendants' reply papers contest the figures generated by plaintiffs, Baker Reply Aff. ¶¶ 11, 16, this shows only that there is a disputed issue of fact that cannot be resolved on summary judgment.

For the foregoing reasons, defendants' motion for summary judgment on plaintiffs' overtime claims under the FLSA based on the motor carrier exemption is denied.

---

[3]  Plaintiffs' usage of the word "trips" refers to the number of collection hauls made by TSB Drivers.

B.      NYLL Overtime Claims

Plaintiffs also seek unpaid overtime compensation under 12 N.Y.C.R.R. § 142-2.2,

"which is analogous to [an] overtime compensation claim . . . under 29 U.S.C. § 207." Zheng v.

Liberty Apparel Co. Inc., 355 F.3d 61, 78 (2d Cir. 2003) (citation omitted).  Defendants assert

that plaintiffs are exempt from § 142-2.2 under the motor carrier exemption of the FLSA.  Def.

Mem. at 7.

New York's overtime regulation expressly incorporates the FLSA's exemptions,

providing that an employer's overtime obligations are "subject to the exemptions of sections 7

and 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act," with limited exceptions not

relevant here.  12 N.Y.C.R.R. § 142-2.2; accord Dauphin, 544 F. Supp. 2d at 277; see also

Romero v. H.B. Auto. Group, Inc., 2012 WL 1514810, at *7 (S.D.N.Y. May 1, 2012) ("[I]f

Plaintiff is subject to the FLSA's exemptions, she is also exempt from the NYLL's protections.")

(citation omitted).  Thus, TSB's overtime obligations under New York law rise or fall depending

on the applicability of the motor carrier exemption.  For the reasons already stated, defendants

are not entitled to summary judgment on the applicability of the motor carrier exemption.

Therefore, summary judgment cannot be granted as to plaintiffs' state law overtime claims.

C.      NYLL "Spread of Hours" Claims

Plaintiffs claim they are entitled to spread-of-hours premiums under New York law.  The

New York spread-of-hours provision requires employers to pay employees "one hour's pay at

the basic minimum hourly wage rate, in addition to the minimum wage," for any day in which

the employee works for more than 10 hours.  12 N.Y.C.R.R. § 142-2.4.  "The employees'

entitlement to this compensation is in addition to any claim for minimum-wage payments or

overtime."  Yu G. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008),

subsequent determination, 2008 WL 5330458 (S.D.N.Y. Dec. 12, 2008) (citation omitted); 12

N.Y.C.R.R. § 142-2.4.  Defendants assert that §142-2.4 does not apply to employees who earn

more than minimum wage.  Def. Mem. at 7.  Plaintiffs contest this conclusion, Pl. Mem. at

33-34, pointing to a case that awarded such spread-of-hours pay to a non-minimum-wage

employee in the course of an inquest following the employer's default.  See Guallpa v. N.Y. Pro

Signs Inc., 2014 WL 2200393, at *5 (S.D.N.Y. May 27, 2014).

        As courts in this circuit have noted, the language at issue makes reference to payment

only beyond "the minimum wage."  See, e.g., Sosnowy v. A. Perri Farms, Inc.,

764 F. Supp. 2d 457, 474 (E.D.N.Y. 2011).  Moreover, the New York State Department of

Labor — the agency that issued these regulations — has issued its own Opinion Letters

"interpreting New York's spread of hours provision as applying only to employees earning

minimum wage."  Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 369 (S.D.N.Y.

2012) (citing N.Y.S. Dep't of Labor 3/16/07 Opinion Letter at 1, File No. RO–07–0009); accord

Sosnowy, 764 F. Supp. 2d at 473.  Thus, recent case law has been nearly unanimous that the

spread-of-hours requirement extends only to workers paid at the minimum-wage level.  See, e.g.,

Juarez v. Precision Apparel, Inc., 2013 WL 5210142, at *12 (E.D.N.Y. Sept. 13, 2013); Malena,

886 F. Supp. 2d at 368-69; Zubair v. EnTech Eng'g P.C., 808 F. Supp. 2d 592, 601 (S.D.N.Y.

2011); Sosnowy, 764 F. Supp. 2d at 473-74; Espinosa v. Delgado Travel Agency, Inc., 2007 WL

656271, at *2 (S.D.N.Y. Mar. 2, 2007), partially reconsidered by 2007 WL 1222858 (S.D.N.Y.

Apr. 24, 2007).  It appears that the only courts that have concluded otherwise have relied on the

case of Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2005).  But the

defendants in that case did "not offer any argument that the regulation's language itself dictates"

that it be limited to workers earning the minimum wage, id. at 340, and the case has been

repeatedly criticized, see, e.g., Guadalupe v. Tri-State Emp't, Mgmt. & Consulting, Inc., 2013
WL 4547242, at *12-13 (E.D.N.Y. Aug 28, 2013) (citing cases); Roach v. T.L. Cannon Corp.,
889 F. Supp. 2d 364, 367-68 (N.D.N.Y. 2012) (citing cases).

Plaintiffs argue that §142-2.4 applies to employees earning above the minimum wage
because the regulation "does not make reference to the fact the employee must be paid at or
below the minimum wage." Pl. Mem. at 34. However, if the New York State Department of
Labor had intended the statute to apply to all wage earners, "it would not have referenced the
minimum wage or easily could have included language stating that the provision applied to all
wage earners." Ellis v. Common Wealth Worldwide Chaueffuered Transp. of NY, LLC, 2012
WL 1004848, at *8 (E.D.N.Y. Mar. 23, 2012). Moreover, the language of § 142-2.4 differs from
§ 146-1.6, which is a similar spread-of-hours provision that applies to employees of restaurants
and all-year hotels, because § 146-1.6 explicitly extends to "all employees . . . regardless of a
given employee's regular rate of pay." 12 N.Y.C.R.R. § 146-1.6(d). That the New York State
Department of Labor did not include similar express language in § 142-2.4 is indicative that it
did not intend the regulation to apply to all wage earners. Thus, we are persuaded that the
"explicit reference to 'minimum wage' in § 142-2.4 indicates that such a provision is properly
limited to those employees who receive only the minimum compensation required by law."
Zubair, 808 F. Supp. 2d at 601. Because it is undisputed that both plaintiffs earned above the
applicable minimum wage at all relevant times, see N.Y. Lab. Law § 652; Williams Aff. ¶¶ 5, 7,
10-11, 15, 17-20; McCoy Dep. at 7, plaintiffs are not entitled to spread-of-hours compensation.

For the foregoing reasons, defendants' motion for summary judgment on plaintiffs'
spread-of-hours claims is granted.

D.    Williams's Unpaid Wages Claims

Williams also seeks unpaid wages under the FLSA and NYLL for work performed at home after being promoted to Fleet Supervisor in October 2010. "To establish liability for unpaid wages under the FLSA or NYLL, the plaintiff has the burden to demonstrate that he performed work for which he was not properly compensated." Hapanowicz v. Alexandria Tile Co., Inc., 2014 WL 1311441, at *7 n.5 (E.D.N.Y. Mar. 31, 2014) (citing Kuebel v. Black & Decker Inc., 643 F.3d 352, 361 (2d Cir. 2011); Doo Nam Yang, 427 F. Supp. 2d at 331-32). "[I]n order to survive summary judgment . . . . [the employee] must 'produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" Kuebel, 643 F.3d at 361 (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)). If an "employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records." Id. at 362 (quoting Anderson, 328 U.S. at 687). However, "if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference.'" Id. (quoting Anderson, 328 U.S. at 687) (alteration in original). "[A]n employee's burden in this regard is not high," and "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." Id. (citations omitted). Here, Williams asserts that TSB's records are inaccurate and that he worked approximately 10-15 hours per week that are not reflected in the records. Williams Aff. ¶¶ 21-23.

Defendants argue that there was no additional work that Williams had to do as Fleet Supervisor because the promotion was primarily a new title used, along with an increase in pay, to reward employees who performed good work. See Def. Mem. at 8; Baker Aff. ¶¶ 33-34.

31

While defendants concede that Williams received at least some phone calls, texts, or e-mails relating to his TSB employment at home, Baker Aff. ¶ 34, they assert that the Fleet Supervisor retained the job duties of a Driver with the added responsibility only of handing out route sheets to TSB Drivers and Hose Operators every morning, id. ¶ 33.  These route sheets, defendants contend, were created by a separate TSB Dispatcher.  Id. ¶¶ 33-34.  Williams contends that in addition to his responsibilities as Fleet Supervisor he had to perform the work of the Night Supervisor, Williams Dep. at 26, who was not performing the Night Supervisor job correctly, id. at 27.  He asserts that he regularly "receiv[ed] calls from the nighttime Drivers regarding any problems they encountered on their routes, arrang[ed] investigations, inform[ed] employees if they were or were not assigned to a route for the following day, and receiv[ed] calls from employees who were calling out sick."  Williams Aff. ¶ 12.

        Defendants also argue that none of these purported hours were ever recorded by Williams.  Def. Reply Mem. at 8.  Defendants note that while TSB uses an automated-timecard-based system to track employee hours, Baker Aff. ¶ 28, it also maintains separate procedures in order to track employee hours that, for various reasons, are not reflected on the automated timecard, id. ¶¶ 29-30; Baker Reply Aff. ¶¶ 5-6.  They assert that if the work was in any way significant, Williams would need only have reported the hours in order to be paid.  Baker Aff. ¶ 34.  Defendants contend that Williams never once mentioned working any extra hours, and that if he had, Baker would have insisted he report those hours and be paid for them.  Id. ¶¶ 35-36.  Williams, however, states that he failed to record these hours because Baker specifically told him that he was not allowed to, and that Williams would not be paid extra for the work he performed at home.  Williams Aff. ¶ 23; Williams Dep. at 29-31.

        Here, issues of fact preclude the granting of summary judgment.  If Williams's account is

true, TSB would be required to pay him for the hours he worked because "once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." Kuebel, 643 F.3d at 363. As another case has noted, "[a]n employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance." Chao v. Gotham Registry, Inc., 514 F.3d 280, 288 (2d Cir. 2008) (citations omitted). "This duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours." Id. (citations omitted). Thus, Williams's failure to properly report the hours worked at home is not dispositive of this issue.

For the foregoing reasons, defendants' motion for summary judgment on Williams's unpaid wages claims is denied.

    E.    Willfulness of Defendants' FLSA Violations under 28 U.S.C. § 255(a)

Defendants seek summary judgment on the ground that plaintiffs cannot prove that defendants violated the FLSA willfully. See Def. Mem. at 6. The effect of a willfulness finding is to extend the statute of limitations period under the FLSA from two to three years. See 29 U.S.C. § 255(a). The burden is on the employee to show that the employer's violation of the FLSA was willful. Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009). Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original).

"An employer willfully violates the FLSA when it 'either knew or showed reckless

33

disregard for the matter of whether its conduct was prohibited by' the Act." Young, 586 F.3d at

207 (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).  "Mere negligence is

insufficient."  Id. (citing McLaughlin, 486 U.S. at 133).  "Plaintiffs must prove more than that

defendant 'should have known' it was violating the law.  'Should have known' implies a

negligence or 'reasonable person' standard.  Reckless disregard, in contrast, involves actual

knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation."

Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 937-38 (S.D.N.Y. 2013), subsequent

determination, 2014 WL 6238175 (S.D.N.Y. Nov. 14, 2014) (internal quotation marks and

citation omitted).  "Reckless disregard of the requirements of the [FLSA] means failure to make

adequate inquiry into whether conduct is in compliance with the Act."  5 C.F.R. § 551.104.  "An

employee can demonstrate his employer's reckless disregard of the FLSA's requirements by

proving his employer was subjectively aware of a 'substantial danger' that the violation existed."

He v. Home on 8th Corp., 2014 WL 3974670, at *6 (S.D.N.Y. Aug. 13, 2014) (citation omitted).

However, "where an 'employer acts unreasonably, but not recklessly, in determining its legal

obligation,' then its action should not be 'considered willful.'"  Serricchio v. Wachovia Sec.

LLC, 658 F.3d 169, 191 (2d Cir. 2011) (quoting McLaughlin, 486 U.S. at 135 n.13).  "Neither an

employer's 'good-faith but incorrect assumption' regarding its FLSA obligations, nor an

employer's lack of a reasonable basis for believing that it was complying with the FLSA, is by

itself sufficient to demonstrate an employer's willfulness."  Saunders v. City of New York, 594

F. Supp. 2d 346, 358 (S.D.N.Y. 2008) (citing McLaughlin, 486 U.S. at 135); accord Difilippo v.

Barclays Capital, Inc., 552 F. Supp. 2d 417, 425 (S.D.N.Y. 2008) ("[A]n employer's mere

negligence or a good faith—but incorrect—belief that they were in compliance with the FLSA,

are not sufficient to rise to the level of a willful violation.").

34

Plaintiffs argue that defendants' knowledge that the FLSA was "potentially at play with its drivers and hose operators" is sufficient on its own to make any violation willful, notwithstanding any good faith belief TSB harbored that its employees were exempt from the FLSA's overtime provision.  See Pl. Mem. at 30-31.  In support of this argument, plaintiffs cite Jiffy June, 458 F.2d at 1141-42, and Halferty v. Pulse Drug Co., 821 F.2d 261, 271 (5th Cir. 1987), which relied on Jiffy June.  In McLaughlin, however, the Supreme Court "readily reject[ed]" the Fifth Circuit's definition of "willful" set forth in Jiffy June, finding it "not supported by the plain language of the statute." McLaughlin, 486 U.S. at 133-34.  A violation does not rise to the level of "willful" merely because the employer knew of the potential applicability of the statute, as it would be "virtually impossible for an employer to show that he was unaware of the Act and its potential applicability." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 127-128 (1985); see also McLaughlin, 486 U.S at 135 (1988) (applying the Thurston standard to claims brought under the FLSA).  A standard of willfulness merely requiring the employer know the FLSA was potentially at play "virtually obliterates any distinction between willful and nonwillful violations." McLaughlin, 486 U.S. at 132-133 (citation omitted).

Plaintiffs have pointed to no testimony from TSB employees, documents, or anything else that would allow a trier of fact to find that defendants' alleged violations of the FLSA's overtime provision were willful.  Even accepting as true plaintiffs' evidence underlying their assertion that the motor carrier exemption does not apply, the merit of plaintiffs' claim is not at all obvious from a legal perspective.  Thus, a factfinder could not reasonably draw the inference that TSB's decision to claim the exemption, if wrong, was undertaken willfully or recklessly. Moreover, while it is not necessary to defeat plaintiffs' claim, the United States Department of

35

Labor completed an audit of TSB's overtime practices in June 2009 and concluded that TSB had properly claimed the motor carrier exemption.  DOL Report at 4.  Defendants say they relied on this report.  See Baker Dep. at 42-43.  While plaintiffs correctly point out that the report relates to a time period prior to the time period at issue here, see Pl. Mem. at 29, the plaintiffs have pointed to no change in the defendants' practices since the report was issued that would render their reliance on its conclusions reckless.  Thus, the report only bolsters defendants' claim that plaintiffs have provided no evidence of willfulness.  See generally Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 475-76 (S.D.N.Y. 2006) (where an employer does not "'take sufficient steps to ensure compliance with the FLSA,'" but it does "make some effort to ascertain whether it was entitled to an exemption[,] . . . . violation[s] of the overtime provisions of the FLSA do not rise to the level of willfulness") (citation omitted).  In short, there is no evidence from which a jury could find reckless or intentional conduct in claiming the motor carrier exemption during plaintiffs' period of employment.  Thus, summary judgment is granted on the issue of willfulness in claiming the motor carrier exemption.

Nonetheless, disputed issues of material fact still exist as to the willfulness of any failure to pay Williams's wages for the 10-15 hours per week he worked as a Fleet Supervisor.  Williams states that he informed Baker about the hours spent working from home, and that Baker told him that he would not be compensated for it.  Williams Dep. at 29-31.  Defendants argue that the "existence of DOL investigations confirming the propriety of an employer's practices relied upon by an employer is a sufficient basis to demonstrate that any FLSA violations are not knowing or willful."  Def. Mem. at 6 (citation omitted).  However, there is nothing to suggest that the DOL approved any refusal to pay wages for hours worked.  Given the undisputed and well-known requirement that employers must pay employees for the hours they

36

work, a reasonable jury could conclude that defendants acted intentionally when they failed to compensate Williams for any work performed at home.

 For the foregoing reasons, defendants' motion for summary judgment on the issue of defendants' willfulness of any FLSA violations is granted as to the FLSA overtime claims and denied as to Williams's FLSA unpaid wages claim.

IV.  <u>CONCLUSION</u>

 Defendants' motion for summary judgment is granted in part and denied in part. Specifically, defendants' motion for summary judgment is granted as to plaintiffs' claims for "spread of hours" pay under the NYLL and whether defendants willfully violated the FLSA's overtime provision; and defendants' motion for summary judgment is denied as to plaintiffs' overtime claims under the FLSA and NYLL, Williams's claims for unpaid wages under the FLSA and NYLL, and whether defendants willfully violated the FLSA with respect to Williams's unpaid wages claim.

Dated: January 23, 2015
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

37